IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2024

## ANNAJOEL SULLIVAN v. TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY

**Appeal from the Chancery Court for Davidson County**
**No. 20-393-IV       Russell T. Perkins, Chancellor**

———————————————————

**No. M2023-01741-COA-R3-CV**

———————————————————

Following an alleged failure to properly assess whether a driver was impaired as part of an investigation of a car crash, the Tennessee Department of Safety and Homeland Security fired a probationary employee trooper. The trooper filed suit, claiming that the Department actually fired her because of her age, sex, and national origin. The trial court granted summary judgment to the Department. The trooper appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Matthew R. Zenner, Brentwood, Tennessee, for the appellant, Annajoel Sullivan.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Rachel A. Newton, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Safety and Homeland Security.

## OPINION

### I.

Appellant Annajoel Sullivan worked for the Tennessee Department of Safety and Homeland Security (the Department) for approximately sixteen months. In December 2019, the Department terminated Trooper Sullivan's[1] employment following her alleged

---

[1] In this opinion, we refer to Annajoel Sullivan as Trooper Trainee Sullivan, Trooper Sullivan, or Ms. Sullivan depending on the most appropriate usage in the particular context. All these references are to

failure to properly investigate whether a driver who had been in a car crash was impaired by prescription drugs and/or alcohol.

Ms. Sullivan, who was born in Russia in 1972, applied for admission to the Tennessee Highway Patrol (THP) Academy on three separate occasions. She was denied admission the first time as a result of her interview. The second time she was denied admission as a result of failing the physical testing. The third time proved to be the charm, and she was admitted to the THP Academy in 2018. Ms. Sullivan was one of five women out of the sixty-seven cadets admitted to this class. She was also the oldest admit to the 2018 class. While her Academy records reflect that the Department expressed some concerns about her progress during the program in several "Counseling/Disciplinary Action" forms,[2] these concerns did not ultimately prevent Ms. Sullivan from completing the Academy's program. When she graduated in December 2018, Ms. Sullivan was one of three women out of 51 total graduates. The Department maintains that it dismissed the two other female cadets from Ms. Sullivan's class because they sustained injuries that would have prevented them from successfully completing the program. When Ms. Sullivan was terminated, there were forty-eight women out of eight-hundred-seventy-two commissioned members of the THP.

In pursuing a position with the THP, Ms. Sullivan signed a "Trooper Probation Awareness Statement." This document apprised prospective troopers that they would be "on probation for eighteen (18) months." Every cadet from the 2018 Academy class had the same eighteen-month probationary period, stretching from July 29, 2018, to January 28, 2020. The Trooper Probation Awareness Statement explained that graduates would gain additional "specialized experience" during the probationary period through an "on-the-job training" program and that graduates were "expected to successfully complete" the training program before the end of the probationary period. The Trooper Probation Awareness Statement also informed troopers, "You may be dismissed during the probationary period if your work indicates you are unwilling or unable to satisfactorily perform your duties or if your work habits or dependability do not merit your continuation in the position."

---

the same person.

[2] For example, Ms. Sullivan was recommended for counseling because she "fell out of the class formation run" and THP Academy staff believed that she needed to "put forth the effort needed to improve [her] physical fitness level." In another form, THP Academy officials expressed concern regarding Ms. Sullivan's failure to complete a required driving test for patrol cars, observing that she allegedly skipped a portion of the test course on purpose. Ms. Sullivan maintains that every cadet received documents like these while at the Academy and that the mere existence of these documents in the record does not confirm that she performed any worse than her classmates. Regarding her THP Academy performance, Ms. Sullivan maintains that she had "excellent numbers. From the women, I was the best."

After graduating from the Academy, Ms. Sullivan joined the Wilson County Post as a THP Trooper Trainee. Wilson County is housed within "District 3," which includes Nashville and thirteen of its surrounding counties. "District 3" is broken down into seven different alphabetically labeled "Troops" for staffing purposes. The Department assigned Trooper Trainee Sullivan to Troop D. Being in Wilson County, Trooper Trainee Sullivan reported to the two Wilson County sergeants: Jeffrey Pollard and Kenneth Hackett.[3] These sergeants reported to Lieutenant Chad Bilbrey, who reported to Captain Anthony Griffin, who reported to Major Robert Johnson, who reported to Lieutenant Colonel James Hutcherson. Each of these THP officials ultimately reported to the Department's deputy commissioner, and all persons in this chain of command within the Department were answerable to the Commissioner, Jeff Long.

The Department assigned field-training officers (FTOs) to oversee Trooper Trainee Sullivan's transition to becoming a fully commissioned trooper. Ms. Sullivan testified during her deposition that, typically, trainees are assigned four FTOs, but that she was given an atypical assignment of eight FTOs to oversee her development, which made her feel uncomfortable. The Department denied in its answer "that there is a standard number of FTOs to which a cadet is assigned during on the job training," but recognized that Ms. Sullivan "was assigned to a total number of eight FTOs during her on-the-job training, some of whom were Phase FTOs and some of whom were temporary fill-in FTOs." Ms. Sullivan, however, maintains that her FTO assignment situation reflects a broader problem in the Department regarding her treatment as an older, Russian-born woman.

She described her sense of her day-to-day interactions during her deposition:

> I felt lonely, not fit. No matter how hard I tried to be a part of the team, I felt I was not fitting in.
>
> . . . .
>
> It's a male-dominated profession, so – and I'm absolutely positive feeling that the men feel like they can do better. Like I said, I didn't, as a woman, interact or interfere with anybody's investigations or with investigations of crashes or whatever the case might be.
>
> But they felt that they have to do it with me, and I felt it was because I was a woman. That's how I felt. That's how it was.

---

[3] Troop D also encompasses Sumner County, which was overseen by its own sergeant, Vincent Turocy. While the record contains evidence that Trooper Trainee interacted with Sgt. Turocy on several occasions, it does not provide clarity on exactly how much daily oversight responsibility, if any, Sgt. Turocy had over Trooper Sullivan at the time of her termination.

. . . .

You feel the difference. I couldn't close that gap, the cultural gap. It was . . . I felt – like I said, that . . . is a difference – again, cultural, yes, the cultural difference. We're totally different.

And being – you hear, "Russian, Russian, Russian, Russian" everywhere, on the traffic stops. The biggest thing to overcome was – it's my accent. It's the breaking the ice. People immediately – I was not hiding that I am Russian, and some people got offended, didn't like it.

So that was the hardest thing, because people ask, "Where are you from? Where are you from? Where are you from?" That was difficult, and it still is. That's the question you don't want to answer. I wanted to be not the Russian trooper. I wanted to be the – Trooper Sullivan when I was there, not the Russian.

. . . .

But the feeling, absolutely. I was not fit. It's like a square peg trying to fit in a round hole. My age, they were more friendly – cadets and troopers – to the younger females than me.

Regarding her national origin specifically, Ms. Sullivan recalled receiving questions from her THP coworkers "about my opinion about Vladimir Putin, 'How is it in Russia? Oh, do you drink vodka?' you know, comments like that in a joking way," which she characterized as harmful stereotyping. Ms. Sullivan further recalled that one of her FTOs had a difficult time "understand[ing] my accent and the way – how I write, the structure of my sentences" and that some of her other FTOs "would say that, 'With your accent, you just have to get used to it.'"

Evaluating Trooper Trainee Sullivan's performance, Sgt. Pollard's assessment included positive comments about her policing traffic fatalities and seatbelt usage but also negative comments about her policing impaired driving and felonies. Sgt. Pollard specifically indicated that Trooper Trainee Sullivan was "not at the level of her peers in the areas of DUI enforcement or misdemeanor/felony drug arrests." There was concern about her under-enforcement. Sgt. Pollard also indicated that she "should be further along in her decision-making skills and knowledge of the job."

Trooper Trainee Sullivan's field training was extended to allow for an opportunity for improvement. She eventually completed her trainee phase. Upon completion of her trainee phase, she officially started operating as a Trooper. However, like the other cadets from her 2018 Academy class, Trooper Sullivan, though moving beyond the trainee phase,

remained in her probationary period.

The central event in this case occurred on October 11, 2019, which was after Trooper Sullivan's completion of the trainee phase but prior to the conclusion of the probationary period. That day, the THP dispatched Trooper Sullivan to the site of an automobile accident in Wilson County involving a vehicle that went off the side of the road, collided with a pole, and became stranded in a ditch. Because the THP dispatched Trooper Sullivan directly, THP protocol indicated that she would oversee the full accident investigation. However, THP protocol also allowed other emergency responders to begin aspects of the investigation pending the dispatched trooper's arrival. That is precisely what happened in this crash investigation, as at least one Sheriff's Deputy, Edward Anderson, and several emergency medical services (EMS) employees arrived at the scene before Trooper Sullivan.

Deputy Anderson approached the vehicle and found the driver "in possession of the keys" and "lying on the passenger floorboard." Though the driver denied consuming alcohol, Deputy Anderson found a bottle of Tito's vodka in the vehicle's locked glovebox. The driver denied any knowledge of the Tito's bottle. Deputy Anderson also noticed that the driver exhibited "multiple clues of impairment," including "pinpoint pupils, slurred speech, and being unsteady on her feet." Deputy Anderson also believed that the driver smelled of alcohol, but an EMS employee disagreed with Deputy Anderson on that point.

The driver also shared that she is diagnosed with Multiple Sclerosis, which "causes muscle weakness and fatigue, and impacts [her] balance." She provided a typewritten list identifying her medications, but she insisted that they "do not impair" her driving ability. However, her medication list featured several painkillers, including ones that can affect a person's senses and cause drowsiness. Ms. Sullivan and the Department's counsel explored this during her deposition:

[Counsel]: Did you look at the medications on the medication list?

[Ms. Sullivan]: Yes.

[Counsel]: It says she's taking diazepam?

[Ms. Sullivan]: Yes. But I'm not very familiar with it. It's something — as I understand, it was a painkiller. I don't take any medications, so — but she said that she took some medications with prescription, yes. Blood pressure — and she was telling me she was taking the blood pressure and everything.

[Counsel]: Did she tell you she was taking a painkiller?

[Ms. Sullivan]: She didn't – no, she didn't tell me that. [crosstalk omitted].

She said that she was visiting Peggy, [who] is disabled, and she had lunch with her, salads. And it was just about less than half a mile from the accident.

[Counsel]: Uh-huh. So are you aware that diazepam is a controlled substance?

[Ms. Sullivan]: To a degree, [crosstalk omitted]. I'm not a doctor. Do I – I said – I don't – nobody in my family takes medications like that.

[Counsel]: Did you receive any training at the Academy or on the job about whether or not prescription medications can cause drowsiness?

[Ms. Sullivan]: A lot of medications can cause drowsiness, yes. She told me she was taking Lyrica. That's for sure. I don't recall that she named it that she was taking that – the painkiller.

[Counsel]: Did you know that Lyrica can cause drowsiness?

[Ms. Sullivan]: No.

[Counsel]: Did you see also that she was taking hydrocodone?

[Ms. Sullivan]: No.

[Counsel]: Well, I see on this list right here "Hydrocodone," the list that – on the picture you took. Do you see that?

. . .

[Ms. Sullivan]: Yeah. Okay. Now I see it, yes.

[Counsel]: Do you know what hydrocodone is?

[Ms. Sullivan]: A painkiller.

[Counsel]: Are you aware that it's a controlled substance?

[Ms. Sullivan]: I'm sure it is. I never took one.

[Counsel]: Are you aware that it can cause drowsiness?

[Ms. Sullivan]: I'm sure it will be. Again, she did not indicate that she was taking painkillers.

[Counsel]: But she gave you this medication list that has the painkillers on it?

[Ms. Sullivan]: She gave me the papers, yes, and I just did the quick snapshot.

[Counsel]: Do you see on there that she – it also says that she's taking Marinol, also known as dronabinol, "Marinol Oral"?

[Ms. Sullivan]: I see it now. I am not familiar with it.

[Counsel]: Do you know what that is?

[Ms. Sullivan]: No, ma'am.

Upon her arrival at the scene, Trooper Sullivan was informed about the Tito's vodka bottle and the driver's multiple signs of impairment, and she was also provided with the driver's list of medications. Despite this information, Trooper Sullivan declined to administer a standardized field sobriety test (SFST). After talking with the driver, Trooper Sullivan did not believe that the driver was driving impaired but instead was simply a person with a medical condition who was shaken up by the accident. She believed that her declining to administer the field sobriety test was an appropriate act of compassion.

Deputy Anderson strongly objected to Trooper Sullivan's decision. When he tried to reassess whether he could smell alcohol on the driver, "Trooper Sullivan told him the driver was fine and Trooper Sullivan motioned for him to move away from her patrol vehicle." Trooper Sullivan also "kept [another] Trooper from getting around the driver." Trooper Tony Phillips, who had also been at the scene, indicated that he observed that the driver had bloodshot and watery eyes. A senior trooper, Drew Heath, who was also at the accident scene, "told Trooper Sullivan she should administer [a SFST] to confirm the driver was not under the influence." Trooper Sullivan declined to do so. Trooper Sullivan similarly "used her body to physically prevent Trooper Heath from gaining access to the driver" at one point but eventually relented. Senior Trooper Heath observed "clues of impairment" similar to those Deputy Anderson observed and contacted Lt. Bilbrey about the situation. Lt. Bilbrey understood the concerns and directed Trooper Heath to communicate again with Trooper Sullivan about performing a SFST. However, when Trooper Heath returned to again recommend that Trooper Sullivan administer a SFST, "he found that Trooper Sullivan had already released the driver to someone and the driver was no longer present." The person to whom the driver had been released was a family member.

In the wake of his interaction with Trooper Sullivan, Deputy Anderson filed a complaint with the Department's Office of Professional Accountability (OPA), triggering

a formal investigation. Ms. Sullivan maintains that she did not receive any notice of the investigation into her conduct until the OPA asked her to sit for an interview. Trooper Sullivan did sign multiple documents in advance of the interview, including an Admonition of Rights and an Awareness Statement. In completing the former, Trooper Sullivan checked a box indicating that she was "willing to make a statement and answer questions at this time."

According to the OPA's file, which is included in the record and contains multiple witness statements and written recommendations, during the interview,

> . . . Trooper Sullivan admitted she was told by EMS that a Deputy could smell alcohol coming from the driver and that Deputy Anderson himself told her he suspected the driver was possibly under the influence . . . . Trooper Sullivan stated that she could not smell an odor of alcohol coming from the driver. According to Trooper Sullivan, she did not administer [a SFST] because she felt the driver was too frail, a responding fire truck had gotten stuck in a ditch, traffic was accumulating, and lines were down across the roadway. Trooper Sullivan stated she did not want Troopers Heath and Phillips to interfere with her investigation and she admitted that she attempted to keep Trooper Heath from speaking with the driver. Trooper Sullivan admitted that Trooper Heath recommended that she should administer [a SFST], and that she told Trooper Heath the driver was just shaken up from the crash. Trooper Sullivan also admitted that if she had a second opportunity, she would have asked more questions and administered [a SFST] to the driver.

The OPA file also notes that Trooper Sullivan did not mention either the bottle of Tito's vodka or the list of prescription medications in her official report. Ms. Sullivan maintains that, although she omitted those details, Sgt. Pollard told her that she would have an opportunity to amend her report. According to Ms. Sullivan, Sgt. Pollard later withdrew that opportunity.

Department officials relying on the OPA's full investigative file concluded that Trooper Sullivan "neglected her duties as a State Trooper by failing to properly investigate the circumstances surrounding this crash, and more specifically, by failing to administer any test(s) in order to determine whether the driver involved was impaired." They further concluded that "Trooper Sullivan's poor decision(s) and associated actions reflect discredit upon the professionalism demanded and exhibited by the other members of the Tennessee Department of Safety and Homeland Security."

Based on the OPA's findings, the Department recommended terminating Trooper Sullivan's employment. It based this recommendation in part on the definition of "unsatisfactory job performance" found in the Department's general orders. The relevant

general order, General Order 216-2, provides that

> a. Employees shall maintain sufficient competency to properly perform their duties and to assume the responsibilities of their positions.
>
> b. Employees shall perform their duties in a manner[] which would tend to establish and maintain the highest standards of efficiency while carrying out the functions and objectives of the Department.
>
> c. Examples of unsatisfactory performance[] include, but are not limited to the following:
>
> . . . .
>
> > (5) Failure of members to take appropriate enforcement action or neglect to protect the scene of a crime, crash, and/or failure to properly investigate such. . . .

The same order also provides that "[e]mployees shall not be inattentive to duty or neglect their duties." According to Captain Christopher Ray, who oversees the OPA and penned several declarations in this matter, Ms. Sullivan's conduct on October 11, 2019, "is a very serious type of neglect of duty that is properly classified as 'serious misconduct' under the Disciplinary Matrix."

The Department created the disciplinary matrix as a standardized method of describing employee infractions, categorizing infractions by their severity, and assigning commensurate discipline. The matrix features six general levels of severity: "very minor," "minor," "moderate," "serious," "severe," and "gross."[4] Some types of infractions only appear under one level of severity, but others are listed in multiple levels of severity. Additionally, some types of discipline are unavailable for a first offense at a particular level of severity. For example, the first instance of "moderate" or lower severity offenses is ineligible for termination, whereas the first instance of "serious" or higher severity offenses is generally eligible for termination.

For Trooper Sullivan, her stated infraction, "neglect of duty," is listed at multiple levels of severity: "minor," "moderate," "serious," and "severe." An officer who commits the "neglect of duty" infraction is eligible for a variety of types of discipline depending on the associated level of severity of the neglect of duty. For "minor" "neglect of duty," the matrix recommends discipline ranging from an "oral warning to 2 day suspension." At the other extreme, the punishments for "severe" "neglect of duty" range from "2 days

---

[4] While the Department writes in its brief that the matrix has "seven" levels of severity, the version of the matrix included in the record appears to only have six levels of severity.

[suspension] to termination." Based on its investigation and in considered the in light of the matrix, the OPA characterized Trooper Sullivan's infraction as "serious" "neglect of duty," which falls in the middle of the two aforementioned extremes. According to the matrix, a trooper's first "serious" "neglect of duty" infraction makes her eligible for discipline ranging from a "written warning to termination." Consistent with the "serious" classification of Trooper Sullivan's "neglect of duty" and the disciplinary matrix, the Department recommended termination of her employment.

This recommendation was assessed through multiple layers of review, reaching at least seven separate Department evaluators. These evaluators ranged from sergeants to the Deputy Commissioner. Each evaluator concurred in the initial recommendation to terminate Ms. Sullivan's employment. Ultimately, Commissioner Long received the recommendation and approved the recommendation. Commissioner Long wrote that he "approved the request to terminate her and signed the letter informing her of her termination." Commissioner Long indicated that "Ms. Sullivan's age, sex, and national origin were not factors in the decision to terminate her."

The Department invited Trooper Sullivan to a meeting at the Tennessee Tower to inform her of its decision. According to Ms. Sullivan, an unnamed individual greeted her at the Tower by stating, "Oh, the Russian." Ms. Sullivan could not identify this individual. However, this unnamed individual was not present during the meeting, and the record does not provide any basis for concluding that this individual played any role in the decision-making process. The participants in the meeting included multiple members of her chain of command. The Department apprised Ms. Sullivan that she was being terminated and gave her a written letter communicating this decision. The letter states:

Trooper Sullivan,

This letter serves as official notice of your dismissal from the Department of Safety and Homeland Security, as Trooper, effective at the close of business on Friday, December 13, 2019. This decision is due to your unsatisfactory performance during your initial probation period.

As a probationary employee with this Department, you are unable to appeal this separation through the appeal process pursuant to the Rules of the Department of Human Resources, Chapter 1120-11. You will be required to turn in your State Issued property (eg: keys, ID cards, badge) and any other property belonging to State Government.

If you have any questions or need additional information you may contact the Human Resources Division . . . .

Responding to her termination, Ms. Sullivan sued the Department in Davidson

County Chancery Court. She alleged that her termination was improperly based on several protected characteristics, specifically her age, sex, and national origin. Ms. Sullivan asserted that the Department violated the Tennessee Human Rights Act (THRA), codified at Tennessee Code Annotated section 4-21-401 et seq. She alleged in part that

> Plaintiff, a 46 year-old female originally from Russia, is a former employee of Defendant and a member of three protected classes. She was qualified for her position and was meeting all reasonable expectations of her employer. Defendant is an employer under the THRA. Plaintiff was discriminated against by Defendant as a result of her age, and/or gender, and/or national origin in that she was terminated without cause or justification, and treated less favorably than Troopers outside her protected class who were not terminated.

Regarding her assertion of less favorable treatment, Ms. Sullivan identified several other troopers who fell outside of her protected class categories and asserted that each received significantly better treatment when it came to receiving discipline after an infraction. Specifically, Ms. Sullivan relied heavily upon the Department's handling of infractions by four other troopers: (1) Tyler Grandstaff, an American-born male trooper in his thirties who had allegedly disobeyed Department orders by chasing a suspect into a heavily populated area in his cruiser; (2) Abasse Meite, a foreign-born male trooper in his twenties who allegedly failed to report and later lied about damage to his cruiser in contravention of Department policy; (3) Jacob Plyler, another male trooper in his twenties who allegedly received complaints based on unprofessional comments he made to a driver during a traffic stop and his failure to appropriately install his squad car's video system; and (4) Chadwick Sanders, another male trooper who failed to "properly notify Dispatch that he was involved in an active pursuit" and failed "to activate his emergency equipment while he pursued the vehicle at an excessive speed for several miles."[5]

Under the Department's disciplinary matrix referenced above, these troopers' infractions were listed as "moderate" in the case of Trooper Grandstaff and "minor" in the cases of Troopers Meite, Plyler, and Sanders. The Department disagreed that these individuals were appropriate comparators in this case. The Department noted that the levels of severity of their various infractions, none of which included "neglect of duty" for failing to administer a SFST, did not rise to the same level of Ms. Sullivan's misconduct. Additionally, the Department noted that it fired what it believed was a similarly situated, younger male native-born employee in 2011 for the same misconduct: failing to properly investigate a potentially impaired driver by declining to carry out a SFST.

The Department sought summary judgment, arguing (1) that Ms. Sullivan, as a probationary employee, could be fired for poor performance; (2) that, under the burden-

---

[5] It appears the record lacks clarity on the national origin of Troopers Plyler and Sanders.

shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), Ms. Sullivan could not establish a prima facie case of discrimination; (3) that terminating Ms. Sullivan for unsatisfactory work performance in response to the allegedly mishandled crash investigation was a legitimate reason for termination; and, (4) that its termination rationale was not pretextual.

The trial court granted the Department's motion for summary judgment. The trial court determined that Ms. Sullivan failed to adequately support her prima facie case. The court concluded that Ms. Sullivan failed to demonstrate that her work performance was satisfactory at the time of her termination, meaning she could not establish a prima facie case of unlawful discrimination under the THRA. Additionally, the trial court reasoned that none of the potential comparators that Ms. Sullivan put forward to demonstrate that she was treated less favorably than similarly situated individuals outside of her protected classes were, in fact, "similarly situated to Ms. Sullivan." The trial court noted the reasons behind Troopers Grandstaff's, Meite's, and Plyler's discipline, and concluded that they were not "engaged in the same or similar conduct as Ms. Sullivan." The trial court concluded that this constituted a second deficiency in her prima facie case. Concluding that Ms. Sullivan could not satisfy multiple elements of a plaintiff's prima facie showing under the THRA, the trial court awarded summary judgment to the Department.

Ms. Sullivan appealed. She set forth her issues on appeal as follows:

1. Did the trial court err in granting Defendant's motion for summary judgment by finding that Plaintiff failed "to prove that her work performance satisfied her employer's reasonable expectations" and therefore did not prove her prima facie case of discrimination based on age, gender or national origin?

. . . .

2. Did the trial court err in finding that Plaintiff failed to show she was treated less favorably than similarly situated employees?

. . . .

3. Did the trial court err in granting Defendant's motion for summary judgment?[6]

In addressing these issues, Ms. Sullivan argues the trial court erred in concluding that she

---

[6] The ellipsis omissions from her statement of the issues reflect her corresponding answers to each of these questions, which she set forth in her statement of the issues section. For issue one, she stated "Yes. A genuine issue of material fact exists as to whether Plaintiff's work performance satisfied her employer's reasonable expectations." For issue two, "Yes. A genuine issue of material fact exists as to whether Plaintiff was treated less favorably than similarly situated employees." For issue three, "Yes. The trial court should be reversed and this case remanded to trial."

was not meeting her employer's reasonable expectations and that she was treated less favorably than similarly situated individuals. She also contends that terminating her based upon failing to perform the standard field sobriety test was unreasonable.

## II.

An appellate court's review of "a trial court's summary judgment decision is de novo without a presumption of correctness." *Regions Bank v. Prager*, 625 S.W.3d 842, 849 (Tenn. 2021). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In making this assessment, a court must view the evidence "in a light most favorable to the claims of the nonmoving party, with all reasonable inferences drawn in favor of those claims." *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019) (quoting *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 286 (Tenn. 2015)). In conducting this review, a Tennessee appellate court makes "a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250.

## III.

According to Ms. Sullivan, the trial court erred in concluding that she had not met her threshold burden of demonstrating a prima facie case of either age, sex, or national origin discrimination. Therefore, Ms. Sullivan contends that the trial court's decision to grant summary judgment should be reversed and that the case should be remanded to consider whether the Department's proposed reasons for firing Ms. Sullivan, i.e., generally unsatisfactory performance as reflected in Sgt. Pollard's evaluations and her response to the October 11, 2019 crash, were merely pretextual excuses to disguise unlawful discrimination. The Department contends that the trial court correctly concluded that Ms. Sullivan failed to satisfy her burden under the first step of the burden shifting framework by failing to make a sufficient prima facie case.

Turning to the statutory scheme at issue in the present case, the THRA has been characterized as a "a comprehensive anti-discrimination statute." *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 426 (Tenn. Ct. App. 2015). Protecting employees in Tennessee against improper discrimination in employment, the THRA provides that

(a) It is a discriminatory practice for an employer to:

(1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin . . . .

- 13 -

Tenn. Code Ann. § 4-21-401(a)(1) (effective July 10, 2017). When assessing THRA claims, Tennessee courts often rely on both federal and state precedents interpreting both the THRA specifically and federal antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA), generally, reflecting the substantial overlap that the THRA has with Title VII and the ADEA. *See, e.g.*, *Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) ("THRA claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964."); *Wilson v. Rubin*, 104 S.W.3d 39, 48 (Tenn. Ct. App. 2002) ("In light of the intended overlap in purpose between the Tennessee Human Rights Act and federal anti-discrimination laws, Tennessee's courts regularly consult the decisions of their federal counterparts for guidance when called upon to construe and apply the Tennessee Human Rights Act."); *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 651 (Tenn. Ct. App. 2001) ("This Court has construed the Tennessee Human Rights Act under the framework of the federal statutes upon which it was patterned, such as the Age Discrimination in Employment Act. . . ."). In this vein, the Tennessee Supreme Court has observed that "[g]enerally, we interpret the THRA similarly, if not identically, to Title VII, but we are not obligated to follow and we are not limited by federal law when interpreting the THRA." *Ferguson v. Middle Tennessee State Univ.*, 451 S.W.3d 375, 381 (Tenn. 2014).

In the present case, Ms. Sullivan claimed that the Department violated the THRA by terminating her employment based on her age, sex, and national origin. As the employee, Ms. Sullivan bears the burden of proving unlawful discrimination in violation of the THRA. *Wilson*, 104 S.W.3d at 49 ("The burden of proving the ultimate issue of unlawful employment discrimination always rests with the employee.").

To assess THRA claims, the Tennessee General Assembly adopted via statute the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Templeton v. Macon Cnty.*, 576 S.W.3d 691, 697 (Tenn. Ct. App. 2018). The THRA delineates this approach as follows:

> (e) In any civil cause of action alleging a violation of this chapter or of § 8-50-103, the plaintiff shall have the burden of establishing a prima facie case of intentional discrimination or retaliation. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the challenged employment action. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination or retaliation raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the challenged employment action and that the stated reason was a pretext for illegal discrimination or retaliation. The foregoing allocations of burdens of

proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation.

Tenn. Code Ann. § 4-21-311(e) (effective June 10, 2011 to May 25, 2025).

An employee may prove intentional discrimination either through direct or circumstantial evidence. *Goree, Inc.*, 490 S.W.3d at 426. "Direct evidence of discrimination is evidence that if credited by the fact finder, would establish the existence of discriminatory intent underlying the employment action without any inferences or presumptions." *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 609 (Tenn. Ct. App. 2007); *see also, e.g.,* 1 Fair Employment Practices § 10:57 (stating that "[d]irect evidence of discriminatory intent is evidence that, if believed, proves the fact of unlawful bias without inference or presumption"). Direct evidence of discrimination is "evidence that 'explains itself'"; such evidence provides the proverbial "smoking gun."[7] *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016)). Alternatively, "[c]ircumstantial evidence, by contrast, requires factfinders to draw inferences from the evidence." *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 895 (6th Cir. 2024).

The trial court determined that "there is no direct evidence of discrimination" by the Department against Ms. Sullivan. On appeal before this court, Ms. Sullivan has not asserted that her case can be made using direct evidence of intentional discrimination; rather, she argues that she has met her burden through circumstantial evidence of intentional discrimination. To make a prima facie showing under step one of the THRA framework, a plaintiff has to demonstrate that he or she (1) is a member of a protected class, (2) is qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by a person outside of the protected class or treated differently than a similarly situated employee who is not a member of the protected class and who engaged in similar conduct. *Goree*, 490 S.W.3d at 449; *see also, e.g.*, *Adebisi v. Univ. of Tennessee*, 341 F. App'x 111, 112 (6th Cir. 2009).

In the present case, there is no dispute as to the elements of protected class and adverse employment action. The Department concedes Ms. Sullivan made her prima facie case as to these elements.

---

[7] A reference to a smoking gun, which has been a "staple of detective fiction," refers to "a piece of incontrovertible evidence." Oxford Dictionary of English Idioms 323 (3d ed. 2009). First stated as a "smoking pistol," the origins of the phrase appear to trace to the murder mystery literary work of Arthur Conan Doyle. Daniel Friedman & Eugene Friedman, *Doyle's World Lost and Found: The Unknown Histories of Sherlock Holmes and Sir Arthur Conan Doyle* (2024); *see also* Max Cryer, *Who Said That First: The Curious Origins of Common Words and Phrases* 302 (2010).

- 15 -

IV.

The trial court, however, found that Ms. Sullivan failed to make her prima facie case demonstrating that she was qualified for the job and that she was treated differently than a similarly situated employee who is not a member of the protected class. The trial court offered detailed explanations of its reasoning as to both elements and an overarching assessment.

Regarding the trial judge's finding that Ms. Sullivan failed to make her prima facie showing of being qualified for the job, the trial court explained its reasoning as follows:

> [To make her required prima facie showing as to this element, Ms. Sullivan was required] to prove that her work performance satisfied her employer's reasonable expectations. This she has failed to do.
>
> Ms. Sullivan was still in the probationary period of her employment at the time of the October 11, 2019 accident and her subsequent termination. During an employee's probationary period, an employee may be discharged if "the employee's performance or conduct during the probationary period indicates that such employee is unable or unwilling to satisfactorily perform or is not satisfactorily performing the employee's duties, or that the employee's habits, dependability, or conduct do not merit continuance in the service." Tenn. Code Ann § 8-30-308(a).
>
> The proof in the record establishes that Ms. Sullivan was discharged for unsatisfactory job performance due to her failure to fully investigate whether the driver involved in the October 11, 2019 crash was impaired. Deputy Anderson discovered the driver, who was in her late forties, on the floor of the passenger side of the crashed vehicle, an opened bottle of vodka in the locked glove compartment, and the keys of the vehicle out of the ignition and on the floorboard of the passenger side where the driver was found. The proof establishes that Deputy Anderson and other law enforcement officers at the accident scene advised Ms. Sullivan that the driver smelled of alcohol and exhibited signs of impairment. The driver presented Ms. Sullivan with a list of medications she was prescribed, some of which could cause drowsiness. Despite this, Ms. Sullivan allowed the driver to leave the scene of the accident with a family member without testing for impairment.[8]

As to the element of being treated differently than a similarly situated employee who is not a member of the protected class, the trial court explained its reasoning as follows:

---

[8] The footnotes from this portion of the trial court's order have been omitted.

The THP previously discharged an American male Trooper for the same conduct as Ms. Sullivan's - failing to properly investigate a vehicle crash by failing to administer a field sobriety test. *See* Jones Decl.; Merrick Decl., ¶ 4(d). Although Ms. Sullivan posits that she was treated less favorably than similarly situated individuals outside of her protected classes, in order to be similarly situated:

> the comparable employee "must be similar in all of the relevant aspects" to the plaintiff. The Sixth Circuit Court of Appeals has explained:
>
>> [T]o be deemed "similarly situated[,]" the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.
>
> [*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)]. One "relevant aspect" to be considered is whether the plaintiff's conduct and the conduct of the person to whom he compares himself are of "comparable seriousness." *Id.* "It is the discrimination plaintiff's burden to establish that the other employee's acts were of 'comparable seriousness' to his or her own infraction." *ld.* at 583 n.5.

*Bundy v. First Tenn. Bank Nat'l Ass'n*, 266 S.W.3d 410, 419 (Tenn. Ct. App. 2007).

The record reflects that only two of the comparators offered by Ms. Sullivan were on probation at the time discipline was imposed, Mr. Abasse Meite and Mr. Jacob Plyler. Both Mr. Meite and Mr. Plyler were in Ms. Sullivan's training class and had the same probationary period; however, Mr. Meite failed to report damage to his patrol vehicle after he struck a guard rail, and Mr. Plyler failed to follow proper procedures regarding the video system installed in his patrol car. Neither of these individuals engaged in the same or similar conduct as Ms. Sullivan, and therefore are not similarly situated to Ms. Sullivan.

- 17 -

Providing an overarching explanation of its decision to grant summary judgment, the trial court stated the following:

> The Court is sympathetic to Ms. Sullivan and does not intend to diminish or discredit her feelings or perceptions in making its determination or to treat the fact that she was a probationary employee as a safe harbor for an employer to defeat an employee's *prima facie* case. However, the Department's reasons for discharging her from employment are grounded in fact — the undisputed evidence in the record shows that Ms. Sullivan was terminated for unsatisfactory job performance during her probationary period for failure to properly investigate whether the driver involved in the October 11, 2019 accident was impaired. "Statutes prohibiting discrimination are not vehicles for second-guessing employment decisions, nor are they intended to transform the court into personnel managers. A case cannot be sent to the jury simply because the court thinks the [Department] might have made an unwise business decision." *Miller v. City of Murfreesboro*, 122 S.W.3d 766, 777 (Tenn. Ct. App. 2003) (citation omitted).

V.

The two prima facie case elements, qualification for the job and being treated differently than a similarly situated employee outside the protected class, stand at the center of the contested ground in this appeal. Ms. Sullivan needs to prevail on appeal as to both elements to render the trial court's award of summary judgment error; otherwise, she has failed to make her required prima facie case, meaning summary judgment was properly granted.

Regarding the job qualification element, the parties divide over what the appropriate contours of analysis are. The trial court in the present case understood that element in relation to "the employer's reasonable expectations" as to the performance of the job. This court has in some cases described this element in terms of "performing at a level that met the employer's reasonable expectations." *See, e.g., Wilson*, 104 S.W.3d at 52; *see also Yount v. FedEx Express*, No. W2015-00389-COA-R3-CV, 2016 WL 1056958, at *5 (Tenn. Ct. App. Mar. 17, 2016). In other cases, in assessing the prima facie case showing, this court has hewed to a more limited understanding of what is at issue with regard to this element. For example, this court has raised skepticism about this "employer's reasonable expectations" analysis being applied as to this element of the prima facie case[9] and noted that "[t]he inquiry as to whether a plaintiff was qualified 'should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.'" *Templeton*, 576 S.W.3d at 701 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)); *see also, e.g., Wallace v. City of*

---

[9] *Templeton v. Macon Cnty.*, 576 S.W.3d 691, 700-01 & n. 8 &9 (Tenn. Ct. App. 2018).

*Lewisburg*, No. M2019-01690-COA-R3-CV, 2020 WL 6390139, at *8 n.5 (Tenn. Ct. App. Oct. 30, 2020).

It is unnecessary to wade further into these waters in the present case. Even if we were to assume arguendo that the trial court erred as to this element, the trial court's award of summary judgment would still be proper. Ms. Sullivan's prima facie case as to the element of being treated differently than a similarly situated employee outside the protected class is deficient.

Addressing what is required for showing a proper similarly situated comparator, this court has explained:

> A plaintiff who seeks to rely on a similarly situated employee to establish a claim of discrimination is not required to show "an exact correlation" between the compared employee's situation and his own, but he is required to show that their situations "'were similar in all relevant respects.'" *Pierce* [*v. City of Humboldt*], [No. W2012-00217-COA-R3-CV,] 2013 WL 1190823, at *11 [(Tenn. Ct. App. Mar. 25, 2013)] . . .). To meet this element of proof, the plaintiff "'must make meaningful comparisons between [him]self and other employees who are similarly situated in all material respects.'" *Id.* (quoting *Spann* [*v. Abraham*], 36 S.W.3d [452,] 468 [(Tenn. Ct. App 1999)]). "[I]t is not necessary to show that the compared employee's situation was identical to that of the plaintiff." *Id.* However, "[t]he comparable employees should have held similar positions, dealt with the same level of supervision, and been subject to the same general employer-imposed work rules and requirements." *Id.* Also, the "similarly situated" individuals must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Castro* [*v. TX Direct, LLC*], [No. W2012-01494-COA-R3-CV,] 2013 WL 684785, at *6 [(Tenn. Ct. App. Feb. 25, 2013)]; *Versa* [*v. Policy Studies, Inc.*], 45 S.W.3d [575,] 581 [(Tenn. Ct. App. 2000)].

*Goree*, 490 S.W.3d at 450; *see also, e.g., Quinn v. Shelby Cnty. Sch.*, No. W2022-00104-COA-R3-CV, 2023 WL 2729674, at *8-9 (Tenn. Ct. App. Mar. 31, 2023), *perm. app. dismissed* (Tenn. July 10, 2023).

Even setting aside the concept of whether Ms. Sullivan's proposed comparators were still on probation, the Department's disciplinary matrix confirms that Troopers Grandstaff, Meite, Plyler, and Sanders were not similar in all relevant respects to Ms. Sullivan. All four of these proposed comparators committed infractions of a lower degree of severity, including one "moderate" instance of misconduct and three "minor" instances of misconduct. The disciplinary matrix does not recommend termination for first offenses

found within these levels of severity, but it does for "serious" and "severe" infractions, which is what Ms. Sullivan allegedly committed as her first infraction. Ms. Sullivan has not, in either her briefing to this court or in the trial court, submitted evidence of an individual outside of her protected classes who also committed a "serious" infraction such as her alleged first infraction but received more favorable treatment. *See Bundy*, 266 S.W.3d at 419 ("It is the discrimination plaintiff's burden to establish that the other employee's acts were of 'comparable seriousness' to his or her own infraction." (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 n.5 (6th Cir. 1992))). As Ms. Sullivan has not produced that kind of evidence, there is no basis to draw an "inference of unlawful . . . discrimination." *See Wilson*, 104 S.W.3d at 52.

In opposition to the trial court's conclusion, Ms. Sullivan asserts that her comparators are similarly situated and contends that their misconduct was worse than Ms. Sullivan's behavior. She insists that her own behavior was actually a reasonable and compassionate approach toward a driver who had been in an accident and was suffering from a medical problem. The disciplinary matrix of the THP, however, is a pre-existing structure for assessing improper conduct and disciplining troopers. Ms. Sullivan has not attempted to demonstrate that the matrix itself is discriminatory on the basis of sex, age, or national origin. Instead, her argument becomes largely mired in what becomes essentially a contention that the THP is making bad decisions with regard to its disciplining of troopers.

Even if we were to assume for purposes of argument that Ms. Sullivan was correct regarding this contention, the THRA does not protect against adverse employment decisions arising out of bad management or bad employer decision-making. In considering the intersection between employment discrimination and such contentions, it is clear that

> employers "may terminate an employee for a good or bad reason without violating [anti-discrimination in employment laws]." . . . [C]ourts [are not empowered] to second-guess nondiscriminatory business judgments, nor does [an anti-discrimination in employment law] replace employers' notions about fair dealing in the workplace with that of judges. We are not a "super-personnel department" assessing the prudence of routine employment decisions, "no matter how medieval," "high-handed," or "mistaken." . . . Put frankly, employers are free to fire their employees for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."

*Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (citations omitted).

The comparators offered by Ms. Sullivan engaged in significantly different conduct than hers. In accordance with a pre-existing disciplinary structure, the Department

- 20 -

regarded those offenses as less serious offenses than those of Ms. Sullivan. Her argument before this court does not help demonstrate that the proffered individuals are actually appropriate comparators but instead merely questions the management of the Department. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2002) (observing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999))). The point of requiring similarity in "all relevant respects" and that the comparator "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct"[10] is to avoid placing the court in the role of becoming a personnel manager or running a department, which is simply not our role. Ms. Sullivan has failed to show that these were appropriate comparators, and, accordingly, they cannot provide the basis for the prima facie case in demonstrating that she was treated differently than a similarly situated employee who is not a member of the protected class and who engaged in similar conduct.

VI.

Outside of her proposed comparators, Ms. Sullivan only presented the trial court with remarks that she heard from her co-workers in Wilson County and with her deposition testimony concerning general feelings of alienation. These are insufficient when it comes to meeting Ms. Sullivan's burden at summary judgment. *See, e.g., Williams v. Greater Chattanooga Public Television Corp.*, 349 S.W.3d 501, 513 (Tenn. Ct. App. 2011) (rejecting assertions concerning age-related comments and attitudes when addressing the fourth element). Comments "standing alone," especially ones that are untethered from the decision-making process, are usually insufficient to "raise an inference of . . . discrimination" under the fourth element. *Wilson*, 104 S.W.3d at 55. That is not to say that comments cannot "when viewed in the context of other statements, support an inference of discriminatory intent," *id.*, but at least as presented here, Ms. Sullivan has not made a connection between the statements she heard while working in Wilson County and the decision to terminate her employment. *See id.* The closest connection that Ms. Sullivan attempted to make in the trial court on this point is her allegation that an unnamed individual greeted her at the Tennessee Tower by saying, "Oh. The Russian," before her termination meeting. However, Ms. Sullivan has provided no evidence of this individual's identity or that this unnamed individual played any role in the decision to terminate her employment. As the trial court noted, this is simply insufficient.

In summation, we agree with the trial court's ultimate conclusion. Ms. Sullivan failed to establish a prima facie case of age, sex, or national origin discrimination under the THRA. Thus, we affirm the trial court's grant of summary judgment.

---

[10] *Goree*, 490 S.W.3d at 450; *see also, e.g., Quinn*, 2023 WL 2729674, at *9.

## VII.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court. The costs of the appeal are taxed to the appellant, Annajoel Sullivan, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE